United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-2674

_____

Nancy Kobrin,                                         *
                                                      *
                    Appellant,                        *
                                                      *  Appeal from the United States
        v.                                            *  District Court for the
                                                      *  District of Minnesota.
University of Minnesota; The Regents                  *
of the University of Minnesota,                       *
                                                      *
                    Appellees.                        *

_____

Submitted: March 10, 1997
Filed: August 12, 1997

_____

Before WOLLMAN, JOHN R. GIBSON, and MAGILL,[1] Circuit Judges.

_____

MAGILL, Circuit Judge.

We revisit this sex discrimination case as Nancy Kobrin appeals from the district court's[2] order that both adopted the special master's[3] findings of fact as well as granted

_____

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

[2]The Honorable Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota.

[3]Special Master Leonard E. Lindquist.

judgment in favor of the defendant, the University of Minnesota (University).  Kobrin argues that the district court's order should be reversed for any one of the following three reasons: (1) she was entitled to have a hearing before a panel of three persons rather than the special master alone; (2) the special master applied the wrong legal standard when reviewing Kobrin's claim; and (3) the University was unable to produce all of the documents that the University is required to maintain under its own hiring guidelines.  We affirm.

**I.**

In 1980, the University settled a class action sex discrimination suit, Rajender v. University of Minnesota, No. 4-73-435 (D. Minn. Aug. 13, 1980), by entering into a consent decree.  Under the terms of the Rajender consent decree, the University must conduct a nationwide search to fill any academic, non-student position.  The University must also make a good faith effort to hire "approximately equally well qualified" female candidates under an affirmative action plan until the percentage of women employed at all levels within a University department equals the percentage of women available for hiring. Rajender Consent Decree at 3-4.  To comply with this requirement, the University annually compiles faculty gender statistics of the percentage of women employed at each level within each department of the University.  As part of its good faith effort, the University has written hiring guidelines for each department.  The hiring guidelines require each department to keep extensive records of its hiring

process.  These hiring guidelines, however, are not part of the Rajender consent decree.

Kobrin became a Ph.D. candidate in the University's Department of Comparative Literature (Department) in 1978.  She also pursued psychoanalytical training as an advanced research fellow at the Institute for Psychoanalysis in Chicago.  Before receiving her Ph.D. in comparative literature from the University in 1984, Kobrin

served as the Acting Program Director for the University's Center for Humanistic Studies (CHS).[4]

After Kobrin received her Ph.D. in 1984, she applied, interviewed, and was selected for the position of CHS Program Coordinator. This selection process complied with the provisions of the Rajender consent decree. The position of CHS Program Coordinator was a non-tenured, year-to-year position that Kobrin held until 1988. In addition to her duties as CHS Program Coordinator, Kobrin also taught some classes for the Department. In 1988, however, the University closed the CHS. Consequently, Kobrin's position as CHS Program Coordinator was eliminated.

Around the same time, two professors resigned from the Department. On the recommendation of one of the resigning professors, the University hired Kobrin as a lecturer[5] for the Department. Kobrin's position as a lecturer for the Department was funded by a "soft money fund," a type of University grant given to a department for a specific purpose on an annual basis. Kobrin was notified that her job would last from September 16, 1989, through June 15, 1990.

After Kobrin was hired as a lecturer, the University informed Kobrin that the creation of the lecturer position for which she had just been hired triggered the

---

[4]The CHS was an interdisciplinary center established by the College of Liberal Arts to promote research in the humanities.

[5]The term "lecturer" applies to non-permanent, non-tenure track teaching positions. These positions can involve some administrative duties as well.

need for a search pursuant to the <u>Rajender</u> consent decree. Kobrin objected to the need for a <u>Rajender</u> search, arguing that she did not occupy a newly created position because the position was not substantially different from her previous position as CHS Program Coordinator. The deans of the Department disagreed with Kobrin and decided that a <u>Rajender</u> search was necessary because, in their opinion, Kobrin's new position was

materially different from her old one.  By the time the deans had made this decision, however, there was not enough time to conduct a Rajender search prior to the start of the academic year.  Therefore, Kobrin was allowed to keep her position as a Department lecturer for one year.  However, the University's Equal Opportunity Office made it clear to the Department that Kobrin could not continue in her position as lecturer unless she was selected for that position in the course of the Rajender search that would be conducted before the start of the next academic year.

To conduct a Rajender search, the Department must first form a search committee.  The committee's job is to make a final selection for the advertised position based on characteristics such as a candidate's training, his or her experience, the quality and quantity of a candidate's published works, and the academic recommendations submitted on behalf of each candidate.  If a Rajender search results in the hiring of a male candidate, the search committee must list the three most qualified women who were considered and document the committee's reasons for not hiring one of these women.

In 1988, the Department approved funding for a new senior faculty position and a new junior faculty position.  Both of these were tenure-track positions.  To fill the two positions, the Department formed a search committee of three women and four men and then advertised for candidates with a solid background in critical theory and a background in at least one of the following areas: literature with an emergent critical interest, continental European critical interest, continental

European literature of a period after 1600, or media studies. About one hundred people applied to the Department for the junior faculty position, including Kobrin. The search committee narrowed this pool to a group of about fifteen candidates, which included Kobrin. The search committee further narrowed the pool of candidates to a group of approximately three finalists. Kobrin, however, was not chosen as a finalist because, in the opinion of the search committee, there were several other candidates that were better qualified than she.

Ultimately, the search committee selected a male, Prabhakara Jha, for the junior faculty position. He had a strong background in literature with an emergent critical interest. For the senior position, the search committee selected a candidate who ultimately declined the offer. Finding no other suitable candidates for the senior position, the committee received permission from the University to hire a second junior faculty member instead. Before filling this position, the University did not recalculate the Department's faculty gender statistics for the junior faculty level, even though the hiring of professor Jha was likely to have changed the percentage of males and females at that level within the Department. The committee finally selected Peter Canning to fill the second junior faculty position. The chair of the search committee informed Kobrin of the committee's decision by mail in July 1989.

After receiving news of the search committee's decision, Kobrin asked for the documents that the Department is required to create under its own hiring guidelines. The Department was able to produce some, but not all, of these documents.

Kobrin filed a Rajender sex discrimination claim against the University in the district court.[6] In her complaint, Kobrin alleged that the Department had

---

[6]As we previously explained in Kobrin v. University of Minnesota, 34 F.3d 698 (8th Cir. 1994) (Kobrin I), "[s]ex discrimination claims against the University are brought under the Rajender consent decree, but Title VII [of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17,] standards still govern the claims." 34 F.3d at 701 n.2.

discriminated against her based on her sex when it failed to hire her for the second junior faculty position. The University subsequently elected not to renew Kobrin's lecturer position.  Kobrin then filed a second Rajender claim against the University in the district court, this time alleging that she was terminated in retaliation for having filed her first claim.

Kobrin's sex discrimination and retaliation claims were considered by a special master, who recommended that the district court grant the University's motion for summary judgment on all claims. The district court adopted the recommendation of the special master and granted the University summary judgment. Kobrin appealed the district court's decision to this Court. We affirmed the district court's grant of summary judgment to the University on the retaliation claim. <u>Kobrin v. University of Minn.</u>, 34 F.3d 698, 705 (8th Cir. 1994) (<u>Kobrin I</u>). However, we found that Kobrin had established a prima facie case of sex discrimination and that there was a genuine issue of fact as to whether the University's proffered reasons for failing to hire Kobrin were mere pretext. <u>Id.</u> at 702-03. Accordingly, we affirmed in part and reversed in part the district court's grant of summary judgement, and remanded the case for further proceedings. <u>Id.</u> at 705.

On remand, the district court appointed special master Leonard E. Lindquist to hear Kobrin's case. The special master held a hearing on Kobrin's sex discrimination claim from April 3, 1995, through April 7, 1995. Although Kobrin was entitled to a hearing in front of a three-person panel under the terms of the <u>Rajender</u> consent decree, at no time before or during the hearing did Kobrin object to the fact that the special master was presiding by himself, nor did Kobrin ever assert before the special master her right to a three-person panel. During this time, Kobrin's counsel was an attorney who was simultaneously representing several other claimants suing the University pursuant to the <u>Rajender</u> consent decree.

After the conclusion of the hearing, the special master wrote an extensive, twenty-eight page report detailing his findings of fact with respect to Kobrin's claims. The special master first recounted the steps that the University had taken in deciding whom it would hire for the second junior faculty position. The special master then found that the Department did not discriminate against Kobrin on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to 2000e-17, when it declined to hire Kobrin. The special master also found that the

Department's failure to hire Kobrin did not violate the affirmative action hiring plan outlined by the <u>Rajender</u> consent decree.

After the special master filed his unfavorable report, Kobrin objected to the special master's findings in the district court. Kobrin objected on the grounds that: (1) she was entitled to a hearing in front of a three-person panel instead of just the special master; (2) the special master had applied the wrong legal standard when he reviewed Kobrin's claim; and (3) the University was unable to produce all of the documents related to the hiring process that the University is required to maintain under its own hiring guidelines.

The district court adopted the special master's findings of fact and entered judgment for the defendants. Kobrin appeals to this Court.

**II.**

Kobrin argues that the decision of the district court should be reversed because she was entitled to a hearing in front of a three-person panel rather than only a special master. We disagree.

Ordinarily, when a party fails to object in a timely manner to the appointment of a special master, the objection is waived. <u>See</u> <u>Burlington Northern R.R. Co. v. Department of Revenue of Washington</u>, 934 F.2d 1064, 1069 (9th Cir. 1991); <u>see also</u> <u>First Iowa Hydro Elec. Coop. v. Iowa-Illinois Gas and Elec. Co.</u>, 245 F.2d 613, 628 (8th Cir. 1957) ("Failure to make [a] timely objection to the appointment of a [special m]aster either at the time

-12-

of the order [appointing the special master] or promptly thereafter constitutes a waiver of error and objections . . . .").  Moreover, where a litigant waits to object to the appointment of a special master until after that special master has filed an unfavorable report, any objections to the appointment of that special master are particularly unpersuasive.  See Burlington Northern, 934 F.2d at 1069.

In the instant case, Kobrin did not immediately object to the appointment of the special master but instead sat on her rights throughout the five-day period during which the special master conducted the hearing. Furthermore, Kobrin did not object to the special master's appointment until after the special master filed his unfavorable, twenty-eight page report. Finally, given Kobrin's counsel's experience in litigating Rajender claims, Kobrin's counsel almost certainly was aware of Kobrin's right to a three-person panel. Nevertheless, Kobrin did not assert her right to be heard by a three-person panel in a timely manner. Based on these factors, we hold that Kobrin waived her right to a three-person panel.

**III.**

Kobrin argues that, although the University has offered a legitimate, non-discriminatory reason for not hiring her, the University's failure to recalculate the Department faculty gender statistics proves that the University's proffered reasons for hiring Canning instead of her were mere pretext for engaging in sex discrimination. According to Kobrin, the district court erred when it did not conclude that the University's failure to recalculate the faculty gender statistics constitutes proof of pretext. More specifically, Kobrin argues that the district court erred when it accepted the University's assessment of Kobrin's qualifications and the University's argument that, even if the University were obligated to recalculate the faculty gender statistics, Kobrin would not have been hired. Kobrin argues that the district court was instead required to

make an independent review of her qualifications for the junior faculty position.  We disagree.

In a Title VII case in which a plaintiff does not present direct evidence of illegal discrimination, the plaintiff has the initial burden of establishing a prima facie case.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993).  Once the plaintiff establishes a prima facie case, there is a presumption that the employer committed illegal discrimination.  Id.  If the plaintiff establishes a prima facie case of illegal

discrimination, then it falls to the defendant to rebut the resulting presumption of discrimination by producing a legitimate, non-discriminatory reason for the defendant's actions. Id. at 506-07. When the defendant proffers a legitimate, non-discriminatory reason for its actions, the presumption of illegal discrimination has been rebutted and it falls to the plaintiff to prove that the proffered reason is mere pretext. Id. at 507. Notwithstanding the presumption of discrimination that arises after the plaintiff establishes her prima facie case, the plaintiff retains, at all times, "the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff . . . ." Id. (quotations, citation, and alteration omitted).

We have already held in Kobrin I that Kobrin established a prima facie case against the University. 34 F.3d at 702. Kobrin has shown that (1) she is a member of a protected class; (2) she was qualified for the position for which the University was accepting applications; (3) she was denied the position; and (4) the University hired a male candidate, Peter Canning, for the position. Id. The University has, however, rebutted the presumption, created by Kobrin's prima facie case, by stating as its legitimate, non-discriminatory reason for hiring Canning instead of Kobrin that Canning was the most qualified candidate for the junior faculty position. Id. at 703. This case thus turns on the issue of whether Kobrin can offer sufficient proof that the University's stated reason for not hiring her was mere pretext. Id.
Under the Rajender consent decree, the University is obligated to hire an approximately equally well qualified female candidate when the percentage of women in the

-16-

hiring pool is greater than the percentage of women at the level in the Department for which a candidate is sought. <u>Rajender</u> Consent Decree at 3-4. The University, however, did not recalculate the faculty gender statistics after professor Jha was hired for the junior faculty position. Kobrin asserts that, had the University recalculated the faculty gender statistics, the University would have been required, pursuant to the <u>Rajender</u> consent decree, to hire an approximately equally well qualified female candidate for the second junior faculty position. Kobrin further asserts that the

University's decision not to recalculate the faculty gender statistics proves that the University's proffered reason for not hiring Kobrin was mere pretext for engaging in sex discrimination.

The district court rejected Kobrin's proof of pretext because the district court had already accepted the University's conclusion that Kobrin was not an approximately equally well qualified female candidate. Mem. Op. (May 7, 1996) at 9. Accordingly, the district court reasoned that the University's failure to recalculate the faculty gender statistics could not be proof of pretext because, even if the University had recalculated the faculty gender statistics, the University would not have been obligated to hire Kobrin since she was not an approximately equally well qualified candidate. Kobrin, however, argues that the district court should have independently assessed Kobrin's qualifications rather than relying on the University's findings.

This Court reviews a district court's conclusions of law de novo and its findings of fact under the clearly erroneous standard. Sawheny v. Pioneer Hi-Bred Int'l, Inc., 93 F.3d 1401, 1407 (8th Cir. 1996). Moreover, it is inappropriate for a court to "sit as a super personnel council to review tenure decisions." Brousard-Norcross v. Augustana College Ass'n, 935 F.2d 974, 976 (8th Cir. 1991) (quotations omitted). As we explained in Kobrin I, we

> accord a high degree of deference to the
> judgment of university decision-makers regarding

candidates' qualifications for academic positions. To prevail, the plaintiff must show something more than a mere dispute over her qualifications for the position. Indeed, in the tenure context, for example, the plaintiff's evidence of pretext must be of such strength and quality as to permit a reasonable finding that the denial of tenure was obviously unsupported.

34 F.3d at 704 n.4 (quotations, alteration, and citations omitted).

The district court's finding that Kobrin was not an approximately equally well qualified candidate was not clearly erroneous. The record contains ample evidence to support the district court's conclusion. For example, the professors on the search committee testified that Kobrin's application was weaker than the applications of several other candidates, both male and female. Professor Ronald W. Sousa, a member of the search committee, testified that Kobrin was at the bottom of the semi-finalist list, not the top. Mem. Op. and Rec. Or. (Feb. 28, 1996) at 16 (Special Master). Professor Nancy Armstrong, another member of the search committee, testified to being underwhelmed by Kobrin's candidacy and specifically noted that she did not find Kobrin to be an approximately equally well qualified candidate. Id. at 17. Finally, professor Rey Chow, also a member of the search committee, testified that not only was Kobrin "not good enough for the department," but also that there were other, better qualified female candidates who had applied for the junior faculty position. Id.

Furthermore, Kobrin was not one of the candidates that the University listed as the three best qualified women candidates, a listing that was required by the Rajender consent decree. As a result, there were at least three women that the University found to be more qualified than Kobrin.

Based on the district court's findings, which are fully supported by the record, it is apparent that Kobrin was not an approximately equally well qualified candidate. Thus, even if the University had recalculated the Department faculty gender statistics, Kobrin would

not have been hired for the second junior faculty position. Accordingly, the University's failure to recalculate the Department faculty gender statistics is not sufficient proof of pretext in these circumstances.

## IV.

Finally, Kobrin argues that the decision of the district court must be reversed because the University was unable to produce all of the documents that the University

is required to maintain under its own hiring guidelines. Kobrin asserts that this demonstrates the University's lack of good faith, a violation of the Rajender consent decree. We disagree.

The determination of whether a party has acted in good faith is a factual determination that we review under the clearly erroneous standard. Cf. McMahon Food Corp. v. Burger Dairy Co., 103 F.3d 1307, 1313 (7th Cir. 1996) ("A trial court's conclusion that a party failed to act in good faith [in the context of a commercial case] is a finding of fact which we reverse only for clear error."); Cramer v. Commissioner, 64 F.3d 1406, 1415 (9th Cir. 1995) ("The Tax Court also found that appellants did not act in good faith. We review this finding of fact for clear error."), cert. denied, 116 S. Ct. 2499 (1996); United States v. Singer, 785 F.2d 228, 234 n.6 (8th Cir. 1986) (reviewing the trial court's determination of good faith for clear error in the context of a criminal case).

Under the terms of the Rajender consent decree, the University was only required to make a good faith effort to hire approximately equally well qualified female candidates. Rajender Consent Decree at 3-4. The University's hiring guidelines are not part of the Rajender consent decree. As a result, that the University was not able to produce all of the documents it is supposed to maintain under its own hiring guidelines was not, by itself, a per se violation of the Rajender consent decree.

Furthermore, the district court's finding that the University had conducted the Rajender search in good

faith is not clearly erroneous.  With respect to the missing documents, the special master specifically found that "[t]here is not one iota of evidence to support a finding that these [missing] documents were intentionally destroyed, nor is there any indication that the documents contained information contrary to the testimony of the three search committee members . . . ."  Mem. Op. and Rec. Or. at 20-21.  Kobrin herself has offered no evidence that the loss of some of the documents was anything other than inadvertent.  Given the University's general

compliance with the terms of the <u>Rajender</u> consent decree when it undertook its search to fill the junior faculty position, the University's failure to maintain every single document required by the University's hiring guidelines is not enough to compel the conclusion that the University failed to act in good faith.

## V.

For the foregoing reasons, we affirm.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.